## IN THE PLAINTIFFS DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| Francis J. Farina, on behalf of himself and all others similarly situated, Plaintiff, | : : : : | |
| vs. | : : | Civil Case No.: 3:23-cv-00050-MOC-SCR |
| Mazda Motor of America, Inc., and Keffer Mazda, on behalf of itself and all others similarly situated, Defendants. | : : : : : | TRIAL BY JURY DEMANDED ON ALL COUNTS |

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

### Background

1.      Plaintiff brings this lawsuit on behalf of himself and a proposed class of past and present owners and lessees (the "Class") of defective 2021 Mazda CX-30, CX-5, CX-9, Mazda3, and Mazda6 vehicles (the "Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and serviced by Defendant Mazda Motor of America, Inc. ("Defendant" or "Mazda").

2.      Plaintiff and the Class are damaged because the Class Vehicles contain defective valve stem seals that allow engine oil to leak into the Class Vehicles' combustion chamber (the "Valve Stem Seal Defect" or "Defect"), which causes the Class Vehicles to consume an excessive amount of engine oil in between regular oil change intervals; places the Class Vehicles at an increased risk of engine failure; violates federal emissions standards; and causes damage to the Class Vehicles' engines and emissions components including, but not limited to, the vehicles' catalytic convertors.

3.      The Valve Stem Seal Defect poses an extreme safety hazard to the environment,

1

drivers, passengers, pedestrians, and the vehicles themselves in the form of prohibited, non-disclosed carbon emissions because it prevents the Class Vehicles' engines from maintaining the proper level of engine oil and causes voluminous oil consumption that cannot be reasonably anticipated or predicted, and which can result in engine failure as well as damage to the vehicles' emissions components including, but not limited to, catalytic converters.

4.    As a result, the Defect can cause engine failure while the Class Vehicles are in operation, exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accidents and injury – as is borne out by several complaints to the National Highway Traffic Safety Administration ("NHTSA").

5.    Mazda – and the Defendant Dealer Class - have long known about the Defect; however, they have refused or otherwise been unable to repair the Defect in the Class Vehicles under Mazda's warranties in violation of the federal Magnuson-Moss Warranty Act.

6.    Plaintiff seeks global recall and/or repairs and/or replacement for the affected engines and emissions systems, reimbursement for the increased oil use, and for Mazda to honor its warranties.

7.    Plaintiff brings this lawsuit on behalf of himself and a proposed class of past and present owners and lessees (the "Class") of defective 2021 Mazda CX-30, CX-5, CX-9, Mazda3, and Mazda6 vehicles (the "Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and serviced by Defendant Mazda.

8.    These vehicles, and the persons who bought them, are easily ascertainable through Defendant's records as pursuant to Technical Service Bulletin ("TSB") 01—12/21, as follows:

2021 Mazda3 (Japan built 2.5T) with VINS lower than JM1BP******403639
(produced before September 14, 2021)

2

2021 Mazda6 (2.5T) with VINS lower than JM1GL******618910 (produced before September 15, 2021)

2021 CX-30 (2.5T)

2021 CX-5 (2.5T) with VINS lower than JM3KF******472325 (produced before September 14, 2021)

2021 CX-9 (2.5T) with VINS lower than JM3TC******541071 (produced before September 14, 2021)

9.      Plaintiff and the Class are damaged because the Class Vehicles contain defective valve stem seals that allow engine oil to leak into the Class Vehicles' combustion chamber (the "Valve Stem Seal Defect" or "Defect"), which causes the Class Vehicles to consume an excessive amount of engine oil in between regular oil change intervals; places the Class Vehicles at an increased risk of engine failure; violates federal emissions standards; and causes damage to the Class Vehicles' engines and emissions components including, but not limited to, the vehicles' catalytic convertors.

10.      Plaintiff also seeks certification of a Defendant Class of Dealerships because they are actively conspiring with Mazda to hide and conceal a known, dangerous defect.

11.      Specifically, the Defendant Class of Dealerships uniformly – and at the behest of Mazda - conceal the true danger by using the exact language contained in Mazda Motor's Technical Service Bulletin(s) ("TSB"):

*Explain the following to the customer:*

*A small amount of the engine oil may be leaking into the combustion chamber, causing the oil consumption. Mazda has confirmed this oil leakage into the combustion chamber will not cause any immediate engine damage and the vehicle may be safely driven. The warning message and CHECK ENGINE light will go off by topping off the engine oil level. This is only a temporary repair and as soon as Mazda identifies the root cause, a complete repair procedure will be announced. Mazda will top off or replace the engine oil at no charge until the complete repair is provided.*

Case 3:23-cv-00550-MOC-SCR   Document 292   Filed 05/07/23   Page 8 of 228
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

TSB 01-012/21 (emphasis added.)

## Clean Air Act and Emissions Standards

12.    Congress enacted the Clean Air Act, 42 U.S.C. §§ 7401 et seq., ("CAA") to protect and enhance the quality of the nation's air resources and to promote the public health and welfare. Title II of the CAA, as amended, and the regulations promulgated thereunder, protect human health and the environment by reducing emissions from mobile sources of air pollution, including motor vehicles. 42 U.S.C. §§ 7521 et seq.

13.    Motor vehicles emit, among other things, nitrogen oxides, hydrocarbon, sulfur dioxide, carbon monoxide, and particulate matter.  These and other pollutants emitted by motor vehicles can cause severe health problems, either directly or as a result of chemical reactions in the atmosphere.  For example, particulate matter is associated with various severe health conditions, such as aggravated asthma and decreased lung function.  Similarly, nitrogen oxides interact with other chemicals in the atmosphere to create ground-level ozone pollution (also known as "smog"), which can cause or exacerbate various respiratory health conditions such as chronic obstructive pulmonary disease.

14.    To limit this pollution and protect the public health, the CAA requires the United States Environmental Protection Agency ("EPA") to promulgate emission standards limiting the types and levels of pollutants that motor vehicles may emit.  42 U.S.C. § 7521; *see* 40 C.F.R. §§ 86.1811-04, 86.1811-09, 86.1811-10 (light-duty vehicle emission standards).  No manufacturer may sell motor vehicles in or into the United States unless the vehicles are designed to comply with emission standards and the manufacturer has obtained a "certificate of conformity" from EPA prior to sale.  42 U.S.C. §§ 7521, 7541(a)(1); 40 C.F.R. part 85, Appendix VIII.

15.    The CAA also requires the manufacturer of a new motor vehicle engine to warrant

4

to the ultimate purchaser and each subsequent purchaser that such engine is "(A) designed, built, and equipped so as to conform at the time of sale with applicable regulations under section 7521 of this title, and (B) free from defects in materials and workmanship which cause such vehicle or engine to fail to conform with applicable regulations for its useful life (as determined under section 7521(d) of this title)." *In re Caterpillar, Inc.*, 2015 U.S. Dist. LEXIS 98784 (D.N.J. 2015), *citing* 42 U.S.C. § 7541(a)(1).

16.     Under the Clean Air Act, an individual may bring a "citizen suit" to enforce its requirements so long as notice of the violation is first provided to EPA, to the state in which the violation occurs, and to any alleged violator at least 60 days before the suit is filed. 42 U.S.C. § 7604(b)(1); Parker v. Hunting Point Apts., LLC, 2015 U.S. Dist. LEXIS 119655 (E.D. Va. 2015); *S.C. Clean Air Initiative, LLC v. Harbor Freight Tools,* 2017 U.S. Dist. LEXIS 77047.(The Clean Air Act, 42 U.S.C. § 7401, et seq. (the "Act") was created by Congress as a comprehensive program for controlling and improving the country's air quality. The Act includes a citizen suit provision that allows citizens to request injunctive relief and civil penalties, payable to the United States Treasury, for the violation of any "emission standard or limitation" under the Act), *citing*, 42 U.S.C. § 7604(a).

17.     CAA section 209(a) preempts states from adopting emission control standards for new motor vehicles.

18.     The State of California, however, maintains a waiver under CAA section 209(b), is the only state which is not subject to the CAA, and, as is relevant herein, the only state allowed to set and enforce its own emissions laws. *See,* Federal Register / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices.

5

## CAA Emission Defect Reporting

19.     Even if properly designed and certified, vehicles may fail to perform as designed because of a defect.  The defect may be, for example, a design or manufacturing error, a malfunctioning part, or an error in the software controlling vehicle functions.

20.     The CAA thus requires manufacturers to provide two warranties: the "Design and Defect Warranty" and the "Performance Warranty.

21.     If – as herein - the defect or actual performance affects one of the many vehicle components designed to control emissions, the vehicle may, in actual use, emit more pollutants than the levels approved in its certificate of conformity and permitted by law.

22.     To encourage manufacturers to timely and appropriately respond to defects that may affect emissions, CAA regulations require manufacturers to file prompt reports notifying the EPA of defective emission-related parts and of manufacturers' efforts to recall and repair vehicles with emission-related defects.  40 C.F.R. part 85, subpart T ( emission defect reporting regulations); *see also* 42 U.S.C. § 7542(a) (requiring manufacturers to "maintain records, perform tests . . . make reports, and provide information the Administrator may reasonably require" regarding compliance with emission standards).

23.     These defect reporting requirements are a "critical . . . compliance tool[]" for ensuring that passenger cars and trucks, in particular, continue to comply with federal emission standards after sale.  EPA, *Vehicle   Engine Compliance Activities, 2014-2017 Progress Report*, at 7.

24.     Specifically, a manufacturer must file an "Emission Defect Information Report," or "EDIR," whenever the manufacturer determines that a "specific emission-related defect exists in twenty-five or more vehicles or engines of the same model year."  40 C.F.R. § 85.1903(a).

6

25. The EDIR is due within "fifteen working days after an emission-related defect is found to affect twenty-five vehicles or engines of the same model year." 40 C.F.R. § 85.1903(b).

26. An "emission- related defect" is defined as any "defect in design, materials, or workmanship" that occurs in i *)* "a device, system, or assembly described in" the manufacturer's approved application for a certificate of conformity that affects various emission-related parameters stated in the regulations or *ii*) "one or more emission-related parts, components, systems, software or elements of design which must function properly to ensure continued compliance with emission standards." 40 C.F.R.§ 85.1902(b).

27. An EDIR must contain a description of the defect, an estimate of the number of affected vehicles, an evaluation of the emissions impact of the defect, an indication of the manufacturer's intended further actions with respect to the defect such as whether a recall is anticipated), and other information. 40 C.F.R. § 85.1903(c).

28. An EDIR filing serves two key functions. First, it encourages manufacturers to identify emission-related defects early and to promptly conduct voluntary recalls to remedy those defects that warrant action.[1] It does this by "extend[ing] . . . surveillance" of emission-related defects "to . . . the manufacturers themselves," 40 Fed. Reg. 18176, 18177 (Apr. 25, 1975), and by requiring them to report to EPA, upon identifying twenty-five instances of a specific defect in a model year, an "evaluation of the emissions impact of the defect" and "[a]n indication of any anticipated manufacturer follow-up," among other information, 40 C.F.R. § 85.1903(b)(5),(7).

29. In requiring manufacturers to grapple with emission-related defects promptly and to disclose relevant information to EPA, the regulations put in place a process to prompt manufacturer-initiated recalls. *See* 40 Fed. Reg. at 18177 (EPA intent "to encourage

Case 3:23-cv-00550-MOC-SCR Document 29-2 Filed 05/02/23 Page 78 of 228
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

manufacturers to repair voluntarily emission-related defects which they discover and report to EPA"); *id.* at 18178 (intent to "encourage manufacturers to repair voluntarily emission-related defects which they determine to exist in vehicles or engines.").[1]

30.     Second, EDIRs provide EPA with an early warning that a vehicle or engine class is at risk of failing to perform as described in the certificate of conformity and required by emission standards. This information, taken together with other indicia of vehicle defects, such as consumer complaints, may lead EPA to investigate a defect and, where appropriate, press the manufacturer to conduct a voluntary recall in cases where the manufacturer was not otherwise doing so. If the manufacturer refuses to recall the vehicles voluntarily, an EPA investigation may ultimately lead EPA to order a mandatory recall. 42 U.S.C. § 7541 ( C) (1) providing that EPA may order a recall when it "determines that a substantial number of any class or category of vehicles or engines, although properly maintained and used, does not conform to" applicable regulations).

31.     The EPA publicly reports the number of EDIRs filed by each manufacturer. EPA's "compliance activity reports" containing this and related information are posted on EPA's website.

32.     If a manufacturer conducts a recall to remedy an emission-related defect in twenty-five or more vehicles or engines, it must also file a Voluntary Emissions Recall Report, or "VERR" with the EPA. This report is due within fifteen working days of when the manufacturer notifies vehicle owners of the recall. 40 C.F.R. § 85.1904(a). In the VERR, the manufacturer must

---

[1] As used throughout this complaint (and in EPA's regulations), a "recall" includes any "repair, adjustment, or modification program . . . to remedy any emission-related defect for which direct notification of vehicle or engine owners has been provided," 40 C.F.R. § 85.1902(d), regardless of whether the manufacturer calls the program a "recall," "service action," "service campaign," "warranty extension," or some other term.

describe the substance of the recall, including technical details about the proposed fix. *ld.*

33. Finally, once an emission-related recall is underway, a manufacturer must file reports describing the progress of the recall (including the percentage of vehicles actually fixed) after each of the subsequent six consecutive quarters  "Quarterly Reports"  with the EPA.  40 C.F.R.§ 85.1904(b).

34. It is a violation of the CAA a manufacturer to fail to file EDIRs, VERRs,  or Quarterly Reports when required to do so.  42 U.S.C. § 7522(a)(2)(A); 42 U.S.C. § 7542(a).

35. It is also a violation for any person to cause a manufacturer to fail to make such filings. 42 U.S.C. § 7522(a).

## Jurisdiction and Venue

36. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as it is brought under the authority of 42 U.S. Code § 7604(a)(1), Citizen Suits, to enforce the CAA.

37. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiff's claims occurred within this District; this District is where Plaintiff purchased the vehicle and has it serviced; Defendant directs and controls warranty repairs on covered vehicles; and this District is where Defendant made repeated misrepresentations to Plaintiff and concealed certain material information from Plaintiff.

## Parties

38. Plaintiff, Francis J. Farina is a resident of North Carolina at 203 Hobbs Street, Davidson, North Carolina 28036.

9

39.     Lake Norman Auto Mall, LLC, d/b/a Keffer Mazda ("Keffer" or "KM") is an authorized Mazda Sales and Service Facility located at 13307 Statesville Rd., Huntersville, NC 28078.

40.     Keffer operates pursuant to terms set by Mazda within their Service and Sales Agreement ("SSA.").

41.     Pursuant to the SSA, KM – and each and every Mazda dealer similarly situated - is required to conceal this Defect at the time of sale and then to spin it as outlined above, withholding the truth as to the severity of the Defect and the consequences which emanate from it, when, as herein, a purchaser returns to the Dealership with low oil prior to a scheduled maintenance interval.

42.     Defendant Mazda is a California corporation with a principal place of business at 200 Spectrum Center Drive, Irvine, Orange County, California 92618.

43.     At all times herein mentioned, Mazda designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and/or sold the Class Vehicles, including the vehicle operated by Plaintiff.

44.     Mazda reviews and analyzes warranty data submitted by Mazda's dealerships and authorized technicians in order to identify defect trends in vehicles.

45.     Pursuant to the SSA, Mazda dictates to the Dealership Class that when a repair is made under warranty (or warranty coverage is requested), its service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction ("CCC"), and also save the broken part in the event Mazda decides to audit the dealership.

Case 3:23-cv-00069-MOC-SCR Document 29-2 Filed 05/00/23 Page 10 of 28
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

46.     Mazda uses this information to determine whether particular repairs are covered by an applicable Mazda warranty or are indicative of a pervasive defect, and both it and the Dealer Class, are required by uniform federal law nearly universally adopted by the several states, to maintain these records for not less than five (5) years.

**Mazda's Engines are Palpably Defective**

47.     Based upon the data generated by its dealers, on November 10, 2020, Mazda acknowledged internally that some of the Class Vehicles consume an excessive amount of engine oil, a symptom of the Valve Stem Seal Defect.

48.     Specifically, on that date, Mazda updated its "High Engine Oil Consumption" "M-Tips" Bulletin to its dealerships, M-Tips No.: MT-005/20, to include, inter alia, 2021 CX-5, 2021 CX-9, and 2021 Mazda6 vehicles, and noted that "Some customers may complain about high engine oil consumption."

49.     The above M-Tip Bulletin provides a process for Mazda dealerships to measure a vehicle's engine oil consumption. Specifically, it directs Mazda dealers to measure a vehicle's engine oil consumption after driving 1,200 miles and states that "[n]o repair is necessary" where a vehicle consumes less than one liter (1.06 quarts) of engine oil within 1,200 miles.

50.     However, Mazda's Owner's Manual and Warranty advise that the recommended oil service interval for Class Vehicles is the earlier of 10,000 miles or one year.

51.     Thus, according to Mazda, a vehicle needs to consume more than eight quarts of engine oil between recommended oil change intervals in order to necessitate a repair for excess oil consumption.

52.     There is nothing normal or expected about this rate of oil consumption and this sort of carbon burn exceeds that which Mazda certified to the Environmental Protection Agency

Case 8:23-cv-00669-MCS-DFM Document 29-2 Filed 05/07/23 Page 12 of 28
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

("EPA"), violates the CAA,[2] and will quickly lead to the breakdown of the vehicle's emissions components – the catalytic convertor especially, as well as the engine itself and its components.

53. On October 4, 2021, Mazda issued Technical Service Bulletin No. 01-012/21, applicable to 2021 Mazda CX-30, CX-5, CX-9, Mazda3 and Mazda6 vehicles that were "produced before September 14, 2021." The bulletin notes that "Some vehicles may have a 'LOW ENGINE OIL LEVEL' warning message and a CHECK ENGINE light illuminated in the instrument cluster, along with DTC P250F:00 stored in memory. Upon inspecting the engine oil level, the level is found to be low and there doesn't appear to be any trace of oil leakage in the engine compartment. This concern usually occurs when the mileage reaches approximately $3,100 - 4,700$ miles (5,000 - 7,500km) and may also occur again after replacing or topping off the engine oil."

54. The October 4, 2021 bulletin further states that "[t]he root cause of this concern has not been identified yet, therefore a repair procedure will be announced at a later date." However, at the same time, the bulletin acknowledges that "[s]ince this issue has been reported after a valve stem seal modification, it is very likely that valve stem seal damage is causing oil to leak into the combustion chamber." (emphasis supplied).

55. Regarding a repair procedure, the bulletin directs dealers that they should first "verify that the oil level is low" and if so, "verify that there is no oil leakage in the engine compartment." "If no oil leakage is found," the bulletin advises that dealer should "top off the engine oil to the FULL level as a *temporary measure" (emphasis added*.)

56. The bulletin also directs dealers to minimize the severity of the Valve Stem Seal Defect to Class Vehicle owners by telling dealers to "[e]xplain the following to the customer: A

---

[2] Plaintiff provided Notice to Defendant Mazda of his intent to bring a claim under the CAA in accordance with 42 U.S. Code § 7604. See Exhibit 1 hereto.

Case 3:23-cv-00069-MOC-SCR Document 292 Filed 05/07/23 Page 12 of 28
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

small amount of the engine oil may be leaking into the combustion chamber, causing the oil consumption. Mazda has confirmed this oil leakage into the combustion chamber will not cause any immediate engine damage and the vehicle may be safely driven. The warning message and CHECK ENGINE light will go off by topping off the engine oil level. This is only a temporary repair and as soon as Mazda identifies the root cause, a complete repair procedure will be announced. Mazda will top off or replace the engine oil at no charge until the complete repair is provided."

57.     Notably, Mazda does not claim that engine oil leaking into the combustion chamber will not cause long term engine damage, but only that it purportedly "will not cause any immediate damage."

58.     On November 24, 2021, Mazda issued a revised version of Bulletin No. 01-012/21.

59.     The revised bulletin was largely identical to the prior one; however, it directs Mazda dealers that if the dealer inspects a vehicle and determines there is no oil leakage, the dealer should either "top off the engine oil to the FULL level as a temporary measure or replace the engine oil if service is due within 1000 miles or 30 days." The bulletin continues to state that "[t]he root cause of this concern has not been identified yet, therefore a repair procedure will be announced at a later date."

60.     To date, Mazda has not provided its dealers with an adequate repair procedure regarding the Valve Stem Seal Defect.

61.     Oil collecting on the stems of intake valves is sucked into the combustion chamber during normal operation.

62.     Hot exhaust gases burn oil on stems of the exhaust valves.

13

63.    If, as is apparent herein, there's too much clearance between the valve stems and guides, the engine will suck more oil down the guides and into the cylinders.

64.    Mazda's problems could be caused by premature valve guide wear or seals that are improperly installed.

65.    The engine may still have good compression but, as herein, will burn oil at rates equivalent to a quart to a quart and a half every thousand miles or up to eight times that which Mazda otherwise certified.

### The Consequences of Mazda's Defect on the Environment & Vehicle

66.    By itself, oil consumption is a well-known source of harmful emissions to the atmosphere. Solid contaminants combined with soot and other oil suspensions influence engine wear, deposits and oil economy (oil consumption rate).

67.    When oil is consumed, it enters the combustion chamber, burns with the fuel and is pushed out with exhaust gases as particles and volatile hydrocarbons.

68.    Fresh new lubricants have more volatile light-end molecules and are more prone to hydrocarbon emissions.

69.    Unburned or partially burned oil is released through the exhaust path in the form of hydrocarbons and particulate contamination (soot).

70.    Additionally, motor oil anti-wear additives are known to poison or at least impair the performance of catalytic converters.

71.    The more oil consumed through the combustion chamber, the greater this poisoning risk/effect.

72.    This escalates the environmental impact further.

Case 8:23-cv-00069-MSS-SPF Document 29-2 Filed 05/00/23 Page 15 of 28
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

73.     Nitrogen oxides (NOx) consist of nitric oxide (NO) and nitrogen dioxide (NO2). These ozone precursors also lead to smog when exposed to hydrocarbon gases and sunlight.

74.     As a health hazard, NOx can potentially cause irritation and damage to lung tissue as well as paralysis.

75.     Because of regulatory requirements and environmental protection pressures to lower both particulates and NO2, increased emphasis has been placed on lubricant formulation, engine design and filter performance.

76.     Mazda, in obtaining proper certifications to sell these vehicles in the United States to Plaintiff and other class members, did not disclose its vehicles would use seven (7) to eight (8) times the amount of oil nor have they come clean since.

77.     Additionally, with the increased carbon accumulating on spark plugs, gas mileage will begin to decline at precipitous rates depending on driving habits. Mazda has not corrected its estimates with the EPA in this regard either.

**Mazda Knew its Engine was Defective Prior to Certification and Sale**

78.     Mazda became aware of the Valve Stem Seal Defect through sources not available to Plaintiff and Class Members, including, but not limited to, pre-production testing, pre-production design failure mode and analysis data, production design failure mode and analysis data, early consumer complaints made exclusively to Mazda's network of dealers and directly to Mazda, aggregate warranty data compiled from Mazda's network of dealers, testing conducted by Mazda in response to consumer complaints, and repair order and parts data received by Mazda from Mazda's network of dealers.

79.     During the pre-release process of designing, manufacturing, engineering, and performing durability testing on the Class Vehicles, which would have likely occurred between

15

2019 and early 2020, before Mazda began selling the Class Vehicles, Mazda necessarily would have gained comprehensive and exclusive knowledge about the Class Vehicles' engines and specifically the valve stem seals: the types and properties of materials used to make them, including their durability and whether those materials would weaken over time regardless of wear and use; the basic engineering principles behind their construction; and the cumulative and specific impacts on the valve stem seals and related engine components caused by wear and use, the passage of time, and environmental factors.

80.     Moreover, pre-release analysis of the design, engineering, and manufacture of the Class Vehicles would have revealed to Mazda that the valve stem seals were defective and allow engine oil to escape into the Class Vehicles' engines' combustion chambers.

81.     Thus, during the pre-release analysis stage of the Class Vehicles, Mazda would have known that the Class Vehicles were defective and would pose a safety risk to the environment, owners/lessees, and the motoring public.

82.     Despite the fact that testing on the Class Vehicles revealed the Valve Stem Seal Defect to Mazda, Mazda failed to remedy the manufacturing processes with the Class Vehicles before putting the vehicles into production and selling them to the public.

83.     Mazda also knew about the Valve Stem Seal Defect once these vehicles were sold in the North American Market because numerous consumer complaints regarding excess engine oil consumption were made directly to Mazda.

84.     The large number of complaints, and the consistency of their descriptions of the symptoms of the Defect, alerted Mazda to this serious Valve Stem Seal Defect affecting the Class Vehicles.

Case 8:23-cv-00069-MSS-SPF   Document 292   Filed 05/07/25   Page 16 of 27
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

**Consequences of Mazda's Failure to File EDIRs and VERRs**

85.     Defendants' violations necessarily have had significant real world consequences.

86.     By failing to timely prepare and submit EDIRs and VERRs, Mazda has avoided performing the self-scrutiny of emission defects intended by the regulations as part of the defect reporting process and deprived EPA of information needed for oversight of Clean Air Act compliance.

87.     Among other things, by failing to file timely EDIRs, Mazda likely delayed or avoided repairing vehicles with emission-related defects, obtaining a significant financial benefit through the deferral and avoidance of recall costs, pushing costs onto consumers, and lengthening the time that unrepaired vehicles with emission-related defects remain on the road.

**Plaintiff Farina's Experiences**

88.     On April 26, 2021 -unaware of Mazda's problems, Mr. Farina purchased a new 2021 Mazda6, VIN No. JM1GL1TY8M1605719, from Keffer Mazda, financing $30,000 over sixty (60) months.

89.     At the time Plaintiff purchased his vehicle, he was unaware that Mazda had determined – five (5) months earlier – that the vehicle he was purchasing would likely have high engine oil consumption. This was not disclosed to Plaintiff (or any other Class member) prior to the purchase of Mazda vehicles.

90.     Being a Certified Public Accountant ("CPA") as well as an attorney, Mr. Farina has kept meticulous notes of his oil consumption and changes:

**SUMMARY OF FARINA 2021 MAZDA OIL CHANGES/ADDITIONS ACQUISITION OF VEHICLE THROUGH 3/31/2023**

| Date | Description | Keffer Invoice Odometer Reading | Interval Miles Driven | Contemporaneous Mileage Log Entry Date | Odometer |
|------|-------------|----------------------------------|-----------------------|-----------------------------------------|----------|
| 4/26/21 | Car delivered | 357 | | 4/26/21 | 357 |

| | | | | | |
|---|---|---|---|---|---|
| 9/21/21 | Oil change | 2,687 | 2,330 | 9/12/21 | 2,676 |
| | | | | 9/26/21 | 2,938 |
| 11/23/21 | Oil change | 7,554 | 4,867 | 11/20/21 | 7,263 |
| | | | | 11/24/21 | 7,661 |
| 3/21/22 | Oil change | 12,509 | 4,955 | 3/19/21 | 12,201 |
| | | | | 3/27/21 | 12,540 |
| 6/12/22 | Oil change | 74,889 | 4,900 | 5/31/22 | 17,409 |
| | | | | 7/19/22 | 17,737 |
| 11/10/22 | Oil added | | 4,170 | 11/10/22 | 21,579 |
| 11/21/22 | Oil change | 25,000[3] | 5,429 | 11/22/22 | 22,838 |
| 1/6/23 | Oil added | | 2,001 | 1/6/23 | 24,839 |
| 2/20/23 | Oil added | | | | 26,662 |
| 3/9/23 | Oil change | 27,517 | | 3/4/23 | 27,268 |
| | | | | 3/18/23 | 27,547 |

91.     When Mr. Farina took the vehicle into the Keffer dealership on November 21, 2022, he questioned the service representative about having to add oil prior to the scheduled service. In response, the service representative informed Farina that this was not unusual and that there was no leak (simply repeating the TSB language outlined above.)

92.     When Mrs. Farina took the vehicle into the Keffer dealership on March 9, 2023, no mention was made to her concerning any TSB.

**Plaintiff Class and Defendant Class Allegations**

**A.     Plaintiff Class**

93.     Plaintiff brings this action on his own behalf, and on behalf all persons or entities who are current or former owners and/or lessees whose vehicles are subject to Technical Service Bulletin ("TSB") 01—12/21.

94.     They are

- 2021 Mazda3 (Japan built 2.5T) with VINS lower than JM1BP******403639 (produced before September 14, 2021)

---

[3] Clearly erroneous entry by Keffer Mazda – see Contemporaneous Mileage Log entries as well as photo of service date sticker affixed to window by Keffer, noting next service due at 3/20/23 or 27,806 miles.

- 2021 Mazda6 (2.5T) with VINS lower than JM1GL******618910 (produced before September 15, 2021)

- 2021 CX-30 (2.5T)

- 2021 CX-5 (2.5T) with VINS lower than JM3KF******472325 (produced before September 14, 2021)

- 2021 CX-9 (2.5T) with VINS lower than JM3TC******541071 (produced before September 14, 2021)

Id.

95.     The Class is so numerous that joinder of all members is impracticable. Although the exact size of the Class (and any separate classes or sub-classes that may be appropriate under Fed. R. Civ. P. 23(c)(5)) is presently unknown to Plaintiff, this information is easily obtainable from Defendants, who have it in their exclusive possession.

96.     Based on preliminary discovery – reported sales - it is estimated that the Class consists of more than one hundred thousand (100,000) consumers nationally.

97.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members including:

a.      whether the Class Vehicles suffer from the Valve Stem Seal Defect;

b.      whether the Valve Stem Seal Defect constitutes an unreasonable safety hazard;

c.      whether Defendant knows about the Valve Stem Seal Defect and, if so, how long Defendant has known of the Defect;

d.      whether the defective nature of the Class Vehicles' valve stem seals constitutes a material defect;

e.      whether Plaintiff and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

f.      whether Defendant knew or reasonably should have known of the Valve Stem Seal Defect contained in the Class Vehicles before it sold or leased them to Class Members;

g.      whether Defendant breached its obligations under the CAA;

h.      whether Defendant has misled the EPA;

i.      whether Defendant continues to mislead the EPA;

j.      whether Defendant has violated the Clean Air Act;

k. whether Defendant continues to violate the Clean Air Act; and

l. the appropriate class-wide measure of damages for the Class.

98. Plaintiff's claims are typical of the claims of other members of the Class, which all arise from the same operative facts and are based on the same legal theories.

99. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has retained counsel who are highly experienced in handling class actions, particularly consumer class actions.

100. Neither Plaintiff nor his counsel have any interests which conflict with or are antagonistic to those of the Class or which might cause them to not vigorously pursue this action.

101. This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members which would establish incompatible standards of conduct for the parties opposing any Class, as well as a risk of adjudication with respect to individual members which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impede or impair their ability to protect their interests.

102. A class action is a superior method for the fair and efficient adjudication of this controversy. The interests of Class members in individually controlling the prosecution of separate claims against Defendants is small given the small amount of the actual damages at issue for each Class member, but which in the aggregate are estimated to involve millions of dollars. Management of the action as a class action is likely to present significantly fewer difficulties than those presented by any assertion of many individual claims.

103. The identities of Class members can easily be obtained from Defendants' computerized and electronic records.

104. Defendant Mazda has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**B.    The Defendant Class**

105. KM – and each of Mazda's 544 dealerships across the USA - knowingly conspired with the manufacturing Defendant to conceal the subject defect.

106. Pursuant to the SSA and TSB, supra, they continue to do so.

107. Therefore, Plaintiff seeks certification of a defendant class action under Rule 23(a) of the Federal Rules of Civil Procedure to include each of the 544 dealerships selling and servicing new Mazdas (collectively, the "Defendant Class.")

108. The Defendant Class is so numerous that joinder of all members is impracticable.

109. A specific identification of each of the 544 dealers who participated in the subject scheme is within the Defendant Manufacturer's sole custody and control, and available with keystrokes.

110. There are questions of law and fact common to the Defendant Class that predominate over any questions affecting only individual Defendant Class members including, but not limited to:

    a.    was relevant, material information about the defect withheld at the time of sale;

    b.    is relevant, material information about the defect continuing to be withheld when an owner presents with a vehicle subject of the TSB; and

    c.    the appropriate class-wide measure of damages

111. Defendant KM is typical of the other dealers in the Defendant Class, in that its actions all arise from the same operative facts and Plaintiff's claims are based on the same legal theories as the claims asserted on behalf of class members against the relevant Dealer.

112.    A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the action as a class action is likely to present significantly fewer difficulties than those presented by any assertion of many individual claims or defenses.

113.    The identities of Defendant Class members can easily be obtained from Defendants' computerized and electronic records.

114.    Defendants and their employees or agents are excluded from the Plaintiff class.

## FIRST CAUSE OF ACTION
### *(Civil Conspiracy)*

115.     Plaintiff incorporates and alleges all paragraphs and averments as though the same are fully set forth within this cause of action.

116.    Defendants, including every member of the Defendant Class, are bound at the hip to act in concert pursuant to the Service and Sales Agreement ("SSA").

117.    Defendants, jointly and systematically, through common and uniform practice, have actively misled consumers prior to sale and thereafter.

118.    Defendants combined or agreed with intent to do an unlawful act, or to do an otherwise lawful act by unlawful means in the manner described above.

119.    As a direct and proximate result of Defendants' joint and concerted action, combination and conspiracy as alleged herein, Plaintiff and the Class have suffered damages, and Defendants are jointly and severally liable for those damages.

## SECOND CAUSE OF ACTION
### *(Declaratory Relief/Judgment)*

120.    Plaintiff incorporates and alleges all paragraphs and averments as though the same are fully set forth within this cause of action.

121.     Plaintiff hereby demands, pursuant to 28 U.S.C. §§ 2201 and 2201 as implemented by Rule 57 of the Federal Rules of Civil Procedure, Declaratory Judgment that Defendants actions and conduct violate federal statutes.

### THIRD CAUSE OF ACTION
#### *Violation of CAA Failure to Timely File EDIRs*

122.     Plaintiff incorporates and realleges all paragraphs and averments as though the same are fully set forth within this cause of action.

123.     Section 208 of the Clean Air Act, 42 U.S.C. § 7542, requires all manufacturers of new motor vehicles to make reports and provide information reasonably required by EPA in connection with Subchapter II, Part A of the Act, which deals with motor vehicle emissions.

124.     Section 203(a)(2) of the Act, 42 U.S.C. § 7522(a)(2), prohibits any person from failing to submit a report required under Section 208 of the Act.

125.     The EDIRs required to be filed by 40 C.F.R. part 85, subpart T, are reports that are required to be submitted pursuant to Section 208 of the Act.

126.     Defendants failed to timely file EDIRs in violation of Section 203(a)(2) of the Act.

127.     Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), Defendants are liable for civil penalties for each separate violation of Section 203(a)(2) of the Act and for each and every day such separate violation continued.

128.     Pursuant to Section 204 a) of the Act, 42 U.S.C. § 7523, the Plaintiff is entitled to injunctive relief to prevent future violations of EDTR regulations, and to mitigate past violations.

129.     Pursuant to Section 7604 (b) of the Act, 42 U.S.C. § 7604, Plaintiff has provided the required Notice of the violation. See Exhibit 1 hereto.

### FOURTH CAUSE OF ACTION
#### *Failure to File VERRS*

130. Plaintiff incorporates and re-alleges all paragraphs are realleges all paragraphs and averments as though the same are full set forth within this cause of action.

131. The VERR reports required to be filed by 40 C.F.R. part 85, subpart T, are reports that are required to be submitted pursuant to Section 208 of the Act.

132. Defendants failed to timely file VERRs, in violation of Section 203 a)(2) of the Act.

133. Pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), Defendants are liable for civil penalties for each separate violation of Section 203(a)(2) of the Act and for each and every day such separate violation continued.

134. Pursuant to Section 204(a) of the Act, 42 U.S.C. § 7523, Plaintiff is entitled to injunctive relief to prevent future violations of VERR regulations, and to mitigate past violations.

135. Pursuant to Section 7604 (b) of the Act, 42 U.S.C. § 7604, Plaintiff has provided the required Notice of the violation. See Exhibit 1 hereto.

### FIFTH CAUSE OF ACTION
***Breach of Implied and Express Warranties Pursuant to the Magnuson-Moss Warranty Act***
***(15 U.S.C. §2301, et seq.)***

136. Plaintiff incorporates and re-alleges all paragraphs are realleges all paragraphs and averments as though the same are full set forth within this cause of action.

137. Mazda, as required by law, warrants both defect and performance of their emission systems:

4. Emission Defect Warranty

Mazda warrants to the ultimate purchaser and each subsequent purchaser that this Mazda Vehicle is designed, built, and certified so as to conform at the time of sale with applicable regulations under Section 202 of the Federal Clean Air Act. This Warranty does not mean that each Mazda vehicle is defect free. For this reason, Mazda provides this Warranty in order to remedy during the warranty period any such defects in materials and workmanship which would cause it to fail to confirm with the applicable regulations during the warranty periods mentioned herein after. The vehicle must be brought to an authorized Mazda dealer for all warranty service. The applicable regulations require that the warranty period is for the first 24

24

months* or 24,000 miles, whichever comes first. However, Mazda will provide you a coverage of 36 months* or 36,000 miles, whichever comes first, under the terms of the New Vehicle Limited Warranty. The applicable regulations also require that the warranty period for specific major Emission Warranty Parts listed in Section 7 is for the first 96 months* or 80,000 miles, whichever comes first.

5. Emission Performance Warranty

Pursuant to Section 207 (b) of the U.S. Clean Air Act, Mazda, in relevant part, warrants to each Owner that if:

(a) The Mazda Vehicle is maintained and operated in compliance with the Written Maintenance Instructions; and

(b) The Mazda Vehicle fails to conform at any time during the term of this warranty to the applicable emission standards as judged by an emission test approved by the EPA; and …

(d) If such nonconformity results from the failure of an Emission Warranty Part.

Mazda *shall* remedy the nonconformity at no cost to the Owner.

138. Plaintiff and members of the Classes are each a "consumer" as defined in 15 U.S.C. § 2301(3).

139. Defendant Mazda is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

140. Defendant KM – and the other 544 similarly situated dealerships - are Defendant Mazda's sales and service agents, operating pursuant to the terms and conditions set within Mazda's SSA.

141. The Class Vehicles are each a "consumer product" as defined in 15 U.S.C. § 2301(6).

142. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with the written and implied warranties.

143. 15 U.S.C. § 2304(a)(1) requires Defendant, as a warrantor, to remedy any defect, malfunction or nonconformance of the Class Vehicles within a reasonable time and without charge to the Plaintiff and Class members.

Case 3:23-cv-00069-MOC-SCR Document 29 Filed 05/00/23 Page 25 of 27
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

144. Defendants' sale of the defective Class Vehicles and its failure and/or refusal to repair the Class Vehicles' Valve Stem Seal Defect within the applicable warranty period constitute a breach of the written and implied warranties applicable to the Class Vehicles.

145. Defendants have failed to remedy the Class Vehicles' defects within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the Class Vehicles.

146. As a result of Defendants' breaches of the written and implied warranties, and Defendants' failure to remedy the same within a reasonable time, Plaintiff and class members have suffered damages.

## JURY DEMAND

147. All prior paragraphs and averments are incorporated herein as though set forth in complete detail.

148. Plaintiff hereby demands a jury trial as to all issues herein.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendants as follows:

a. An order certifying the proposed plaintiff and Defendant Dealer Classes, designating Plaintiff as named representative of the Plaintiff Class, and designating the undersigned as Class Counsel;

b. An order awarding Plaintiff and class members their actual damages, incidental and consequential damages, punitive damages, and/or other form of monetary relief provided by law;

c. An order awarding Plaintiff and the class members restitution, disgorgement, or other equitable relief as the Court deems proper;

d. Equitable relief including, but not limited to, replacement of the Class Vehicles with new vehicles, or repair of the defective Class Vehicles with an extension of the express warranties and service contracts which are or were applicable to the Class Vehicles;

26

e.      A declaration requiring Defendant Mazda to comply with the various provisions of the federal statutes herein alleged and to make all the required disclosures to the EPA;

f.       Reasonable attorneys' fees and costs;

g.      Pre-judgment and post-judgment interest, as provided by law;

h.      Plaintiff demands that Defendant Mazda perform a recall or repair or repurchase of all Class Vehicles;

i.      Civil penalties, pursuant to Section 205(a) of the Act, 42 U.S.C. § 7524(a), and the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, codified as amended at 40 C.F.R. Part 19, against Defendants for each violation of Section 203(a)(2)(A) of the Act of $30,000 up to $60,000 per day per violation occurring between the beginning of production of these vehicles up to and including those produced on or before September 13, 2021; and

j.      Such other and further relief as this Court deems just and proper.

Respectfully Submitted April 7, 2023.

The DiGuiseppe Law Firm, P.C.

By: /s/ Raymond M. DiGuiseppe
NC State Bar No. 41807
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
(910) 713-8804
law.rmd@gmail.com


M<sup>c</sup>Leod │ Brunger PLLC

By:/s/Joseph A. O'Keefe
Joseph A. O'Keefe,
Co. #52229, Pa. # 77068
Pro-Hac Pending
10375 Park Meadows Drive, Suite 260
Lone Tree, CO 80124
(720) 443-6600
jokeefe@mcleodbrunger.com

*Attorneys for Plaintiff*

Case 3:23-cv-00050-MOC-SCR   Document 29-2   Filed 05/00/23   Page 27 of 28
FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND